IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

UNITED STATES OF AMERICA,                          Case No. 2:13-CV-00685-SU

       Plaintiff,                                          FINDINGS AND
                                                    RECOMMENDATION

   v.

JACQUELINE EDLEFSEN both individually
and as trustee of the EDLEFSEN FAMILY
TRUST; THOMAS EDLEFSEN both
individually and as trustee of the EDLEFSEN
FAMILY TRUST; MORO INVESTMENTS,
LLC; HOWARD EUGENE SPENCER;
BRENDA R. SPENCER; CHARLES D.
BROWN; CINDY K. BROWN; GRETCHEN
ANDERSON as trustee of the EDLEFSEN
FAMILY TRUST; MARIANN PETERSON as
trustee of the EDLEFSEN FAMILY TRUST;
EDLEFSEN FAMILY TRUST; OREGON
DEPARTMENT OF REVENUE; SHERMAN
COUNTY; and GEORGE VELOZ,

       Defendants.

_____

Page 1 - FINDINGS AND RECOMMENDATION

SULLIVAN, Magistrate Judge:

The United States of America ("plaintiff") filed a complaint against Jacqueline and Thomas Edlefsen ("JE" and "TE," respectively), Moro Investments, LLC ("Moro"), Howard and Brenda Spencer, Charles and Cindy Brown, Gretchen Anderson, Mariann Peterson, the Edlefsen Family Trust ("EFT"), the Oregon Department of Revenue, Sherman County, and George Veloz. Plaintiff seeks to reduce the outstanding federal tax liabilities assessed against TE and JE to judgment and foreclose upon the Gordon Ridge Property and Sherman County Property (collectively the "Subject Properties"). With the exception of TE, JE, and the EFT, all other defendants have been dismissed, after stipulating to a lack of interest in the Subject Properties, or had default judgments entered against them. In addition, an Order has been entered regarding the lien priorities between plaintiff, the Oregon Department of Revenue, the Spencers, and Sherman County. Plaintiff moves for summary judgement pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, plaintiff's motion should be granted.

## BACKGROUND[1]

This case involves a dispute over plaintiff's entitlement to foreclose federal tax liens arising out of JE's and TE's failure to pay income taxes between 1997 and 2002.[2] In the early 1990s, JE began attending classes with National Trust Services ("NTS"), an organization that "promoted

---

[1] Background information is taken largely from plaintiff's motion and supporting exhibits. However, as discussed in greater detail below, while evidence furnished by JE and TE may be inadmissible, the Court refers to certain facets of that evidence to the extent it provides context for the underlying dispute.

[2] Although JE and TE are married, they separated in 1995, such that plaintiff's "tax assessments are made against each individually." Pl.'s Mem. in Supp. of Mot. Summ. J. 2; TE's Resp. to Mot. Summ. J. Ex. 7.

Page 2 - FINDINGS AND RECOMMENDATION

abusive trust arrangements intended unlawfully to avoid Federal and State income, estate, and gift taxes." *Rossman v. Comm'r of Internal Rev.*, 2006 WL 1686413, *1 n.3 (U.S.Tax.Ct. June 20, 2006) (collecting cases); *see also* TE Dep. 13-14; Brown Decl. Ex. J, at 8; Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 6. Accordingly, by 1991, JE believed that "the income tax system . . . was fraudulent in its origin and illegal in its operation and enforcement," and beginning in 1997, she refused to "pay any further taxes." Brown Decl. Ex. J, at 8. In addition, JE, in conjunction with other family members, established and/or participated in several "complex trust systems" pursuant to NTS's guidance. Walker Dep. 29-31, 70.

I.    Overview of NTS-Related Trusts and Entities

While the ETF and Moro are the only entities named as defendants in this action, a variety of other entities played roles in the underlying dispute, such that a brief overview of their origin and activities is helpful. In 1992, JE's now-deceased mother, Vivian Walker ("VW"), created the MSW Family Trust; VW placed all of her property therein and initially made JE and Kenneth Hardman, a member of NTS, trustees. JE's Resp. to Mot. Summ. J. Exs. 32-33. JE and VE later established the ETC Trust as the business arm and the Tarka Foundation as the charitable arm of the MSW Family Trust. JE's Resp. to Mot. Summ. J. Exs. 9-10, 16; Walker Dep. 81. In 1995, the ETC Trust purchased Sunrise Sanitation, LLC ("Sunrise") for $253,000. JE's Resp. to Mot. Summ. J. Exs. 9, 20, 23. VW also formed the Three Rivers Trust, listing Mark Deen, JE's son, as trustee; this trust received nearly $200,000 in payments from Sunrise between 1999 and 2001. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 21; Brown Decl. Ex I. The ETC Trust also made a $30,000 contribution to Sunrise during that time. *Id.*

By 1999, JE was conducting seminars and selling trust packages in conjunction with NTS.

Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 6; Brown Decl. Ex. R.  Thereafter, Roy Fritts, one of

NTS's founders, formed the Hope Life Foundation using NTS documents and, together with JE,

began marketing complex trust packages.  Brown Decl. Exs. P-T; JE's Resp. to Mot. Summ. J. Ex.

13; *see also* JE's Resp. to Mot. Summ. J. 2-3.  The Hope Life Foundation executed promissory notes

in favor of the Tarka Foundation on the following dates and in the following amounts: September

14, 2000 - $60,000; October 14, 2000 - $60,000; December 14, 2000 - $60,000; and February 6,

2001 - $15,000.  JE's Resp. to Mot. Summ. J. Ex. 14.

II.     Formation and Activities of the EFT and Moro

On January 23, 1992, TE and JE formed the EFT.  Specifically, JE, TE, and Mitchell Shaw

Walker Jr., JE's brother, signed a Trust Indenture, which identified JE as the grantor and beneficiary,

and TE and Walker as trustees.  Pl.'s Mem. in Supp. of Mot. Summ. J. Exs. 14-15.  The same day

the EFT was formed, Walker resigned as trustee and was replaced by JE.  Pl.'s Mem. in Supp. of

Mot. Summ. J. Ex. 14, at 8-9.  On January 24, 1992, the  EFT resolved to pay for JE's and TE's

living expenses, such as housing, transportation, health care, and education.  Pl.'s Mem. in Supp. of

Mot. Summ. J. Ex. 15, at 7-8, 11-12.  The EFT did not have any employees and TE was the only

person authorized to write checks out of EFT accounts or otherwise control the trust's activities.  TE

Dep. 53-55, 61, 107; *see also* Walker Dep. 48-49, 128-29 (Walker testifying that he was not involved

with the EFT and, in fact, had no recollection of ever acting as a trustee); *see also* Deen Dep. 85-86

(Deen testifying that he was neither involved with the EFT nor aware that he was listed as a trustee

on any EFT document).

In 1999, the EFT was funded, for the first time, with proceeds from the sale of a property in

Yuma, Arizona (the "Yuma Property"), owned by the EFT, with TE acting as trustee, and the ETC

Trust, with JE acting as trustee.  Brown Decl. Ex. H, at 1.  Neither the EFT nor any other entity associated with JE, TE, or VW paid taxes on this nearly two million dollar transaction.  TE Dep. 101-02; Pl.'s Supplemental Resp. Ex. BB.  Subsequently, although TE and JE frequently assigned their trustee duties and beneficial interests to others, they continued to control the EFT.  Brown Decl. Ex. M, at 1; TE Dep. 53-55, 61-62, 69-70, 107.  Further, the EFT never made distributions to any listed beneficiary.  TE Dep. 58.

In 2006, Moro was established as an Oregon limited liability company.  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 25.  The Gordon Ridge Property is listed as Moro's principal place of business and mailing address, and Walker and Deen are identified as Moro's members.  *Id.*  JE was the sole decision-maker in regard to Moro, which was created in order to insulate the Sherman County Property from the Internal Revenue Services's ("IRS") collection efforts.  Walker Dep. 39-40, 66, 72, 75-76, 78-79.  As such, Moro has no employees, engages in little to no activity, and has no formal membership meetings; Walker and Deen have little involvement with Moro and never received any compensation therefrom.  *Id.* at 42, 44-47, 64-66; Deen Dep. 92, 94.

A.    The Gordon Ridge Property

 "The Gordon Ridge Property consists of two parcels of real property located in Sherman County, Oregon" with "a street address of 73002 Gordon Ridge Rd., Wasco, Oregon 97065."  Pl.'s Mem. in Supp. of Mot. Summ. J. 11; *see also* Am. Compl. ¶ 19 (providing a legal description of the Gordon Ridge Property).  On February 11, 1992, the Browns purchased the Gordon Ridge Property from the Spencers.  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 9.  On December 27, 1995, the Browns transferred their interest in that property to TE and JE, "as trustees or successor trustees of" the EFT, in exchange for $160,000.  Pl.'s Mem. in Supp. of Mot. Summ. J. Exs. 10, 12.  TE

negotiated the sale of the Gordon Ridge Property and satisfied the purchase price by using his personal funds and assuming the mortgage previously held by the Browns.  TE Dep. 62-63, 69-70; Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 11.

From 1995 until approximately 2005, JE resided rent-free at the Gordon Ridge Property and made improvements thereon, and TE and/or JE routinely paid the "mortgage, and utilities, garbage, etc. etc."  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 16; TE Dep. 66-67; Walker Dep. 68-70.  JE especially "liked to work in the yard" and kept a miniature horse and donkey at the property, even after she stopped living there.  Walker Dep. 70; Deen Dep. 84-85.  JE also used the property for her personal business activities with Sunrise.[3]  TE Dep. 63, 65-67.  In 2006, TE listed himself as the owner of the Gordon Ridge Property on a personal loan application.  TE Dep. 76; Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 17.  During 2008, JE and TE allowed Deen and his wife to live at the property rent-free.  TE Dep. 83-84; Deen Dep. 38, 81-82; Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 16.  Any income earned from the property through rental contracts negotiated by TE was deposited into a commingled account.  TE Dep. 66, 149-50; Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 18.

On June 30, 2010, a Grant Deed was recorded in Sherman County that transferred the Gordon Ridge Property from TE, as "previous trustee of the Edlefsen Family Trust," to "Gretchen Anderson and Mariann Peterson, trustees for the benefit of Edlefsen Family Trust."  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 13, at 1, 6.  Neither Anderson nor Peterson performed any work on behalf of the EFT and both disclaimed any interest in the Gordon Ridge Property.  TE Dep. 37, 54, 56; Order on

---

[3] The record indicates that JE managed and/or controlled Sunrise, at least throughout the approximately ten year period Sunrise operated out of the Gordon Ridge Property.  TE Dep. 66-67; Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 20; JE's Resp. to Mot. Summ. J. Exs. 5, 7, 9-10; *see also* JE Resp. to Mot. Summ. J. 6; TE's Resp. to Mot. Summ. J. 3.

Stipulated Mot. 2 (June 20, 2013); Order on Stipulated Mot. 2 (July 12, 2013).

      B.      <u>The Sherman County Property</u>

The Sherman County Property consists of two tracts of undeveloped land, identified as Sherman County Account No. 2741 ("Parcel 1") and Sherman County Account No. 1528 ("Parcel 2"). Am. Compl. ¶ 20. On May 7, 1997, Sherman County deeded Parcel 2 to the Tarka Foundation. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 23. On January 8, 1999, Larry Thompson conveyed Parcel 1 to the ETC Trust by Warranty Deed recorded in Sherman County. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 19. Both parcels were acquired through funds provided by the ETC Trust. Walker Dep. 81-82; *see also* Oral Argument Hearing (June 3, 2014); JE's Supplemental Mot. 2-3. On June 10, 1999, JE executed and recorded a Warranty Deed transferring Parcel 1 from the ETC Trust to Sunrise; she signed on behalf of both entities as the "Mag Member" and no consideration was provided for this conveyance. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 20.

On July 6, 2006, the Tarka Foundation conveyed Parcel 2, via Warranty Deed, to Moro. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 24. That same day, Warranty Deeds were recorded in Sherman County transferring Parcel 1 from Sunrise to Walker and Deen, as trustees for the ETC Trust and the Three River Trust, respectively, and then later from Walker and Deen, again as trustees, to Moro. Pl.'s Mem. in Supp. of Mot. Summ. J. Exs. 21-22. The stated consideration for all of these transactions was "other than money." *Id.*; Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 24; *see also* Walker Dep. 80. Except for a brief period during 2010 and 2011, JE paid property taxes on the Sherman County Property. Walker Dep. 48.

III.     <u>Tax Deficiencies Assessed Against TE</u>

On February 25, 2005, after conducting an examination and calculating tax deficiencies for

1998 through 2002, a duly authorized delegate of the Secretary of Treasury sent a Notice of Deficiency to TE. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 1, at 13-14; *see also* 26 U.S.C. § 6212. On May 24, 2005, TE, through his attorney, filed a petition with the United States Tax Court ("Tax Court") contesting, among other issues, the Notice of Deficiency's determination that the EFT and Edlefsen Enterprises Trust should be disregarded for income tax purposes. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 1, at 1-12. On April 24, 2006, TE filed a motion for continuance of the trial before the Tax Court, in which TE admitted that he had not filed a tax return for any of the years at issue but continued to dispute whether income from the EFT or Edlefsen Enterprises Trust was attributable to him. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 2.

On May 10, 2006, TE entered into a stipulation with the IRS, in which he conceded all issues in the Notice of Deficiency except for: (1) whether deposits identified as deriving from the Tarka Foundation, Sunrise, the ETC Trust, Centauri, and the Three River Trust were properly characterized as his income; (2) the taxability of a $14,000 check from the 2000 tax year; and (3) the taxability of a $76,348.27 check from the 2002 tax year. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 3. On May 15, 2007, the Tax Court entered a decision concerning TE's tax deficiencies, penalties, and interest for the 1998-2002 tax years. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 4. On August 27, 2007, the IRS made an assessment against TE, via IRS Form 4340, in the amount of $556,558.86. Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 5.

IV.    Tax Deficiencies Assessed Against JE

On July 31, 2002, after being assigned to conduct an examination of JE's potential federal income tax liabilities, IRS Agent Dennis Brown contacted JE and requested that she file returns for the 1997-2001 tax years and/or explain why she believed she did not need to do so. Brown Decl.

¶ 1 & Ex. A.  On August 10, 2002, JE replied: "I a[m] not sure if I am required to file U.S. tax return . . . Please supply me with the information of why or how I would be required to file."  Brown Decl. Ex. B, at 1.  In response, Brown provided a detailed explanation of the federal income tax filing requirements and requested that JE schedule an interview and produce documents relevant to the period in question.  Brown Decl. Ex. C, at 1-5.  On September 30, 2002, Brown received a letter from JE challenging the IRS's authority, the legality of the IRS's summonses, and the federal income tax code.  Brown Decl. Ex. D.  On October 11, 2002, Brown reiterated to JE the applicability of the tax code; he also informed her that the proper venue to dispute the IRS's authority or summons was in the United States District Court.  Brown Decl. Ex. E.

Because she refused to furnish any information to the IRS or sit for an interview, Brown continued his investigation to reconstruct JE's income.  *Id.*  Accordingly, Brown issued summonses to U.S. Bank, Commercial Equipment Leasing, PrimeVest, and Columbia River Bank to gather information about any bank accounts in JE's name or under her control, including those of the ETC Trust, the Hope Life Foundation, the Three Rivers Trust, the EFT, the Tarka Foundation, and Sunrise.  Brown Decl. ¶¶ 3, 6, 13.  Likewise, Brown collected escrow documents from the Yuma Property sale[4] and issued a summons to accountant Donna Miller, who eventually provided financial statements, payroll tax returns, and check registers from JE's business activities.  *Id.* at ¶¶ 14-15; *see also* Brown Decl. Ex. H.  Throughout this time, JE continued to send letters challenging Brown's legal authority and opposing his investigation, to which Brown regularly responded.  Brown Decl.

---

[4] Plaintiff asserts that "this sale alone accounts for a substantial portion of the income Brown ultimately assessed against Ms. Edlefsen . . . As shown in the explanation provided to Ms. Edlefsen, Brown credited Ms. Edlefsen with basis in the Yuma property, and assessed only half of the gain against her for the 1999 tax year."  Pl.'s Mem. in Supp. of Mot. Summ. J. 5 (citing Brown Decl. Ex. L).

Page 9 - FINDINGS AND RECOMMENDATION

Exs. F-G.

Using materials obtained through his investigation, Brown created detailed spreadsheets and bank deposit analyses to determine the income attributable to JE. Brown Decl. Ex. I. On October 31, 2003, Brown informed JE of her proposed income tax liability for the 1997-2001 tax years and requested that she contact him and file valid returns. Brown Decl. Ex. J, at 14-30. On November 20, 2003, JE sent a letter, again challenging Brown's authority and refusing to meaningfully respond. *Id.* at 1-13. Namely, JE made numerous assertions regarding the federal income tax system and why she was not required to pay taxes, including, but not limited to: "the Government is prohibited by the 4th and 5th amendments from compelling individuals to sign and file an income tax form 1040," "the IRS does not have the authority to require individuals to keep and turn over documents," and "wages, salaries, tips, interest, income and even capital gains are not taxable because they do not arise from [a] corporate activity or privilege." *Id.* On December 10, 2003, Brown sent a letter explaining the validity of federal tax laws and noting that "[f]ederal courts have consistently ruled against the arguments you have made"; he also included an IRS pamphlet, refuting "Commonly Used Frivolous Arguments." Brown Decl. Ex. K.

On May 7, 2004, Brown notified JE that the IRS was considering penalties for her participation in NTS-related tax avoidance transactions and requested that she contact the IRS to arrange an interview and produce certain documents. Brown Decl. Ex. N. On May 16, 2004, JE specified that she would "no longer respond to you or argue with you as you lack the proper delegation of authority to go into private and confidential areas of my life," threatened "declaratory and injunctive relief upon your next contact," and included promotional material from the Free

Enterprise Society about former IRS employee and certified public accountant Joe Banister.[5]  Brown Decl. Ex. O.  Due to JE's continued lack of cooperation, Brown interviewed numerous clients who purchased complex trust packages and reviewed their tax returns; he also obtained the checks that were used to pay JE.  Brown Decl. ¶ 23; *see also* Brown Decl. Exs. P-Q.  This information revealed that JE had been depositing proceeds from her trust sales into bank accounts under the name of the ETC Trust and the Hope Life Foundation.  Brown Decl. ¶ 23.  Brown ultimately identified twenty-three clients who had purchased trust packages between 2000 and 2001, and calculated a corresponding $1,000 penalty for each verified sale.  Brown Decl. Exs. R-S.

On August 19, 2004, a statutory Notice of Deficiency was sent to JE by certified mail that contained an explanation of its legal effect and the taxes assessed.  Brown Decl. Ex. L; *see also* Brown Decl. Ex. M; 26 U.S.C. § 6212.  Because she failed to file a petition challenging the Notice of Deficiency with the United States Tax Court by November 17, 2004, a duly authorized delegate of the Secretary of Treasury made an IRS Form 4340 assessment against JE for the 1997-2001 tax years in the amount of $1,965,193.11; this sum included unpaid taxes, interest, and penalties.  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 7; *see also* 26 U.S.C. § 6213.

On June 6, 2006, Brown sent a closing letter to JE concerning promoter penalties for the 2000 and 2001 tax years, resulting from the sale of trust packages. Brown Decl. Ex. T.  JE subsequently "refused" the IRS's "offer" pursuant to "Regulation Z" and "UCC-3501." Brown Decl. Ex. U.  On August 14, 2006, a duly authorized delegate of the Secretary of Treasury assessed

---

[5] Like TE and JE, Banister questioned the validity of the income tax system.  *See, e.g.*, Brown Decl. Ex. O, at 2.  He was disbarred for, amongst other reasons, erroneously advising clients that they were not subject to federal tax liability because the Sixteenth Amendment had not been properly ratified.  *Banister v. U.S. Dep't of the Treasury*, 2011 WL 7109220, *1-2, 6 (N.D.Cal. Mar. 10, 2011).

promoter penalties against JE for the 2000 and 2001 tax years in the amounts of $15,000 and $11,000, respectively,  pursuant to 26 U.S.C. § 6700.  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 8.

V.    Proceedings Before This Court

On April 24, 2013, plaintiff filed a complaint in this Court, alleging claims to: (1) reduce the outstanding federal tax liabilities assessed against TE and JE to judgment; and (2) foreclose the corresponding federal tax liens against the Subject Properties.  Compl. ¶¶ 1, 20-103; *see also* 26 U.S.C. §§ 6502, 6321.  On June 20, 2013, the Court granted a stipulated motion to dismiss Peterson as a defendant in this action, as she disclaimed any interest in the Subject Properties.  That same day, the Court approved a stipulated lien priority between plaintiff and the Spencers.  On June 26, 2013, plaintiff filed an amended complaint, the only material difference being the addition of Veloz as a defendant.  *Compare generally* Compl., *with* Am. Compl.

On July 12, 2013, the Court granted a stipulated motion dismissing Anderson as a defendant, as she also disclaimed any interest in the Subject Properties.  On October 3, 2013, plaintiff, Sherman County, the Spencers, and the Oregon Department of Revenue stipulated to an order of distribution for any sale proceeds from the Subject Properties; these parties also agreed to "excuse" Sherman County "from further participation in this action."  Order on Stipulated Mot. 1 (Oct. 3, 2013).  On November 18, 2013, the Court granted a stipulated motion concerning the lien priority between plaintiff and the Oregon Department of Revenue.

On January 7, 2014, plaintiff deposed JE.  JE invoked the Fifth Amendment privilege against self-incrimination in response to all of plaintiff's deposition questions.  *See, e.g.*, JE Dep. 5-6.  On February 20, 2014, a default judgment in favor of plaintiff was entered against the Browns, Moro, and Veloz, leaving JE, TE, and the EFT as the only remaining defendants litigating plaintiff's claims.

On March 3, 2014, plaintiff filed the present motion.  Oral argument was held on June 3, 2014.  On

July 2, 2014, pursuant to the Court's order, plaintiff furnished additional documents, along with an

index of the materials underlying its investigation into TE's and JE's tax deficiencies.  *See generally*

Pl.'s Supplemental Resp.  On July 7, 2014, JE and TE each separately filed supplemental motions

reiterating their opposition to summary judgment and requesting further proceedings. *See generally*

JE's Supplemental Mot.; TE's Supplemental Mot.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories,

admissions on file, and affidavits, if any, "show that there is no genuine dispute as to any material

fact and that the [moving party] is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Substantive law on an issue determines the materiality of a fact.  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

*Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).   Whether the evidence is such that a

reasonable jury could return a verdict for the nonmoving party determines the authenticity of a

dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material

fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of

a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts

which show a genuine issue for trial.  *Id.* at 324.  Special rules of construction apply when evaluating

a summary judgment motion: (1) all reasonable doubts as to the existence of a genuine issue of

material fact should be resolved against the moving party; and (2) all inferences to be drawn from

the underlying facts must be viewed in the light most favorable to the nonmoving party.  *T.W. Elec.*,

809 F.2d at 630.

## DISCUSSION

Plaintiff asserts that summary judgment is appropriate because IRS Form 4340 tax assessments have been made against JE and TE, the EFT and Moro hold the Subject Properties as nominees/alter egos of JE and TE, and all other defendants have either stipulated to a lack of interest in the Subject Properties or the order of lien priority, or had default judgments entered against them. Further, plaintiff contends that TE and JE cannot, as a matter of law, rebut the presumptive validity of the deficiencies assessed against them because: (1) the doctrine of claim preclusion bars TE from relitigating his Tax Court proceedings; and (2) JE cannot offer any additional argument or evidence at this stage in the proceedings due to her categorical invocation of the Fifth Amendment during the January 2014 deposition.

"In general, all U.S. citizens . . . are liable for income taxes imposed by the Internal Revenue Code." *Lujan v. Comm'r of Internal Revenue*, 2000 WL 1772503, *3 (U.S.Tax.Ct. Dec. 4, 2000) (citation omitted).   In an action to collect unpaid taxes, the government bears the initial burden of proof. *Palmer v. Internal Revenue Serv.*, 116 F.3d 1309, 1312 (9th Cir. 1997) (citing *United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir. 1983), *cert. denied*, 465 U.S. 1079 (1984)).  This burden can be met through the presentation of a federal tax assessment, "supported by a minimal evidentiary foundation." *Stonehill*, 702 F.2d at 1293 (citation omitted).  Generally, "a presumption of correctness attaches to the [government's tax] assessment, and its introduction establishes a prima facie case." *Id.* (citation omitted).  "Certificates of Assessments and Payments," also known as IRS Form 4340, are "routinely used to prove that a tax assessment has in fact been made." *Huff v. United States*, 10 F.3d 1440, 1445 (9th Cir. 1993), *cert. denied*, 512 U.S. 1219 (1994) (citations and internal quotations omitted).  "To rebut the presumption of correctness, the taxpayer has the burden of

proving that the assessment is arbitrary or erroneous." *Stonehill*, 702 F.2d at 1294 (citations and internal quotations omitted).

I.    <u>Preliminary Matter</u>

A preliminary matter must be addressed before reaching the substantive merits of plaintiff's motion.  TE and JE have consistently and repeatedly argued that they do not have to pay taxes because their assets are legally held in trusts or trust-related entities.  *See, e.g.*, JE's Resp. to Mot. Summ. J. 5; TE's Resp. to Mot. Summ. J. 4; *see also* Oral Argument Hearing (June 3, 2014); JE's Supplemental Mot. 2-3.  As such, central to this dispute is whether any income from the various entities either directly or tangentially at issue in this case, including the EFT, the ETC Trust, Sunrise, Moro, the Hope Life Foundation, and Three Rivers Trust, is properly attributable to TE and/or JE. In light of TE's and JE's pro se status, the Court briefly addresses the legal milieu surrounding complex trust systems similar to those marketed by NTS.

NTS, or entities like it, represent "that taxpayers [can] regain their inalienable rights and freedoms by attending [a] workshop [that cost thousands of dollars] where they [will] learn to create their own trusts that purportedly [will] protect taxpayers' assets while lowering or eliminating their tax liabilities." *Nhuss Trust v. Comm'r of Internal Revenue*, 2005 WL 2542535, *3 (U.S.Tax.Ct. Oct. 11, 2005) (internal quotations and brackets omitted); *see also* Brown Decl. Exs. P, Q.  Fritts, who managed NTS, and later the Hope Life Foundation, "claimed to be a lawyer and world authority on complex trusts." *Nhuss*, 2005 WL 2542535 at *3; Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 6. Sam Fung, who also had an association with NTS, "purporte[d] [to be] a certified public accountant" and prepared tax returns on behalf of those who purchased trust packages. *Nhuss*, 2005 WL 2542535 at *3; *see also* Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 6 (NTS solicitation literature, holding out

Fritts as executive trustee, JE as trustee, and Fung as trustee, tax preparer, and educator on "how to deal with IRS problem[s]"); JE's Resp. to Mot. Summ. J. Ex. 31 (billing statement for a tax return prepared by Fung on behalf of JE's and/or TE's trust or trust-related entities); TE's Resp. to Mot. Summ. J. Ex. 12 (same).

Although "[t]axpayers have a legal right to structure their transactions to minimize their tax obligations by whatever means allowable under the law[,] [t]ransactions that have no significant purpose other than to avoid tax and do not reflect economic reality . . .  will not be recognized for Federal income tax purposes." *Kooyers v. Comm'r of Internal Revenue*, 2004 WL 2930978, *10-11 (U.S.Tax.Ct. Dec. 20, 2004) (citing *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Zmuda v. Comm'r of Internal Revenue*, F.2d 1417, 1421 (9th Cir. 1984)).  In other words, "[t]he IRS may disregard an entity for tax purposes where such entity lacks economic substance." *United States v. Renfrow*, 612 F.Supp.2d 677, 689 (E.D.N.C. 2009) (citing *Richardson v. Comm'r Internal Revenue*, 509 F.3d 736, 741 (6th Cir. 2007); *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1354 (Fed.Cir. 2006)).  Accordingly, courts have repeatedly found NTS-related or similar complex trust systems, such as those at issue in this case, "to be shams for tax purposes." *Id.*  (collecting cases and noting that one of NTS's founders "was enjoined by a federal court from promoting these fraudulent trust systems"); *see also Kooyers*, 2004 WL 2930978 at *6-7 (trust formed pursuant to NTS guidance "should be disregarded for Federal income tax purposes and the income reported by the trusts taxed to petitioners" because "[c]ourts have consistently invalidated similar trusts for Federal income tax purposes") (citations omitted); *Bowen v. Comm'r of Internal Revenue*, 2001 WL 193675, *2 (U.S.Tax.Ct. Feb. 27, 2001) (NTS-related "trusts must be disregarded for Federal income tax purposes"); *Lund v. Comm'r of Internal Revenue*, 40 Fed.Appx. 592, 593 (9th Cir. 2002) (complex

Page 16 - FINDINGS AND RECOMMENDATION

trusts "lacking in economic substance are considered shams and are properly disregarded for federal income tax purposes").

As discussed herein, JE and TE were periodically designated as beneficiaries or trustees of the various entities at issue in this case. However, even when they were not so designated, JE and TE continued to operate and control these entities. The named trustees, other than JE and TE, were not compensated, did not perform any meaningful work, and, in some instances, were not even aware of their statuses as such. The named beneficiaries also never received any payments or distributions. Further, TE attempted to procure a bank loan using the Gordon Ridge Property as collateral. Finally, JE and TE had unrestricted use of the Subject Properties, which they transferred amongst their various entities absent any consideration. Therefore, although not directly at issue in this case, because the uncontroverted evidence of record demonstrates that the various entities controlled by JE and TE lacked economic substance, the IRS's determination that they were shams for tax purposes is well-supported and proper.

II.     Judgment Relating to Taxes Assessed Against TE

Claim preclusion, also known as res judicata, "provides that a final judgment on the merits of an action precludes the parties from re-litigating all issues connected with the action that were or could have been raised in that action." *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 898-99 (9th Cir. 2001) (citation omitted); *see also Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 528-29 (9th Cir. 1998) ("res judicata bars all grounds for recovery that could have been asserted, whether they were or not, in a prior suit between the same parties on the same cause of action") (citation and internal quotations and brackets omitted). Claim preclusion is determined by whether "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of

Page 17 - FINDINGS AND RECOMMENDATION

competent jurisdiction; (3) there was a final judgment on the merits; and (4) the same claim or cause

of action was involved in both suits." *Rein*, 270 F.3d at 899 (citation omitted).  In other words "[i]f

these four elements are met, the parties are precluded from raising all issues connected with the

original action that were or could have been raised."  *United States v. Cermak*, 2013 WL 6403075,

*3 (D.Or. July 9), *adopted by* 2013 WL 5674999 (D.Or. Oct. 17, 2013).

In this case, after initially challenging his tax liabilities, TE stipulated, through counsel, to

the majority of assessments made against him.  *See* Pl.'s Mem. in Supp. of Mot. Summ. J. Exs. 1-3.

Based on that stipulation, the Tax Court entered a decision concerning TE's tax deficiencies,

penalties, and interest for the 1998-2002 tax years.  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 4.

The IRS then issued a Form 4340 notice consistent with the Tax Court's decision.  Pl.'s Mem. in

Supp. of Mot. Summ. J. Ex. 5.  Res judicata therefore precludes TE from relitigating his tax

liabilities, or otherwise presenting evidence to rebut plaintiff's prima facie case, in these proceedings.

*See United States v. Lund*, 2013 WL 1363339, *1-2 (D.Or. Jan. 31), *adopted by* 2013 WL 1363283

(D.Or. Apr. 1, 2013) (affording preclusive effect to prior proceedings before the Tax Court).  First,

the parties here are identical to those before the Tax Court.  Second, the Tax Court is a court of

competent jurisdiction.  Third, by entering a decision upholding the IRS's proposed tax assessments

based on TE's stipulation, the Tax Court made a final judgment on the merits.  *Cermak*, 2013 WL

6403075 at *3.  Fourth, the only claim before the Tax Court related to TE's tax liability for the

1998-2002 tax years.

Even if the doctrine of claim preclusion is not implicated, the arguments and evidence first

introduced by TE via his opposition brief and at oral argument do not create a genuine issue of

material fact.  It is undisputed TE did not file tax returns for the years in question and that he

Page 18 - FINDINGS AND RECOMMENDATION

received statutorily required notice of the deficiencies assessed against him.  *See generally* TE's Resp. to Mot. Summ. J.; Pl.'s Mem. in Supp. of Mot. Summ. J. Exs. 2-5; *see also Cermak*, 2013 WL 6403075 at *3-4 (outlining the requirements for a valid tax assessment).  Essentially, TE disagrees with the IRS's determination regarding the legal effect of his authority and control over the EFT and other trust-related entities.  *See* TE's Resp. to Mot. Summ. J. 4.  However, as discussed herein, the subject entities were merely nominees or alter egos for TE.  Further, to the extent TE maintains that he did not intend to stipulate to the tax deficiencies assessed against him before the Tax Court, and that his counsel's representation was ineffective, his argument is unavailing.  *See* Oral Argument Hearing (June 3, 2014).  Presuming this issue is both relevant to and litigable in these proceedings, the fact remains that TE failed to rebut plaintiff's prima facie case.

Indeed, the evidence furnished by TE is either irrelevant or duplicative of that which is already in the record.  *See generally* TE's Resp. to Mot. Summ. J. Exs. 1-18.  For instance, TE includes several legal documents, which pertain to the EFT's purchase of the Gordon Ridge Property, to establish that the trust, as opposed to TE and JE, own that property.  *See* TE's Resp. to Mot. Summ. J. Exs. 1-2, 5; *see also* TE's Resp. to Mot. Summ. J. Exs. 16-17 (EFT formation documents).  That the EFT is listed as the purchaser is not determinative for tax purposes where, as here, a nominee or sham entity is involved.  *The Colby B. Foundation v. United States*, 1997 WL 1046002, *21-22 (D.Or. Oct. 22, 1997); *see also Kooyers*, 2004 WL 2930978 at *6-7.

Thus, while TE has set forth conclusory allegations regarding the invalidity of the IRS's tax assessments, he neglected to set forth any evidence demonstrating that these assessments were, in fact, arbitrary or erroneous.  *See Celotex*, 477 U.S. at 322 (summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden on proof at trial"); *see also*

*Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) ("conclusory allegations,

unsupported by facts, are insufficient to survive a motion for summary judgment") (citation omitted).

TE is liable for the 1998-2001 tax liabilities assessed against him and plaintiff's motion should be

granted as to this issue.

III.    Judgment Relating to Taxes Assessed Against JE

The issues surrounding JE's tax liability are more complex than those relating to TE.  JE

invoked the Fifth Amendment during her deposition, which "protects a person from compelled

testimonial communication that is incriminating."  *United States v. Lund*, 2011 WL 6963106, *3

(D.Or. Dec. 14, 2011), *aff'd*, 2013 WL 6698767 (9th Cir. Dec. 20, 2013) (citation and internal

quotations and ellipses omitted).  The Fifth Amendment only extends to "real dangers, not remote

and speculative possibilities, [such that its application] is contingent upon a clear showing, by the

person invoking the privilege, of a real and substantial danger of self-incrimination by the

information sought."  *Id.* (citations omitted).  A taxpayer's mere assertion of the right based on the

belief that the testimony may be incriminatory is insufficient.  *United States v. Bright*, 569 F.3d 683,

690-91 (9th Cir. 2010).  "More importantly, 'the fifth amendment privilege may not itself be used

as a method of evading payment of lawful taxes.'"  *Lund*, 2011 WL 6963106 at *3 (quoting *Edwards*

*v. Comm'r of Internal Revenue*, 680 F.2d 1268, 1270 (9th Cir. 1982)).

Furthermore, "[t]rial courts generally will not permit a party to invoke the privilege against

self-incrimination with respect to deposition questions and then later testify about the same subject

matter at trial."  *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 909-10 (9th Cir. 2008) (citation

omitted).  Additionally, "[w]hen a party asserts the privilege against self-incrimination in a civil case,

Page 20 - FINDINGS AND RECOMMENDATION

the district court has discretion to draw an adverse inference from such assertion." *Id.* at 911 (citations omitted). This inference may be drawn when "there is independent evidence of the fact about which the party refuses to testify," a "substantial need for the information" exists, and "there is not another less burdensome way of obtaining that information." *Id.* at 912 (citations and internal quotations omitted). Thus, "[t]he district court must determine whether the value of presenting the evidence is substantially outweighed by the danger of unfair prejudice to the party asserting the privilege." *Id.* (citations and internal quotations and brackets omitted).

Plaintiff asked JE questions during the January 2014 deposition relating to all facets of this lawsuit and put forth relevant evidence. *See generally* JE Dep.; Pl.'s Supplemental Resp. For example, plaintiff queried: "What were your sources of income between 1997 and 2001?"; "Did you file any tax returns from 1997 through 2001?"; "Are the assessments that are at issue in this case valid assessments against you?"; "If that is not an accurate statement of your tax liabilities, could you tell me what is inaccurate about it?"; "Was the [EFT, the ETC Trust, the Three Rivers Trust, the Tarka Foundation, Moro, or Sunrise] created to avoid federal income taxes . . . or hide assets from the IRS"; "Did you work for [NTS]?"; "Have you held yourself out as the owner of the Gordon Ridge Property?"; "Are you in a position of control or authority over the [EFT]"; "[W]hy didn't you file a petition with the United States Tax Court"; and "Who made the decision to transfer [the Sherman County Property] from Sunrise [to Walker and] Deen?" *Id.* at 12-17, 20, 22, 31, 33, 45. Plaintiff also confronted JE with documents establishing her tax liability during the time period at issue. *See generally id.*; Pl.'s Supplemental Resp. JE responded to each of plaintiff's inquiries as follows: "I take the Fifth Amendment, and I reserve all of my rights." *See, e.g.*, JE Dep. 12. Plaintiff sought to the clarify the basis of JE's blanket assertion of this defense:

Q: Has anyone threatened you with criminal prosecution in this case?

A: No.

Q: So what's the basis of your fear of prosecution?

A: Well, I reserve my rights . . .

Q: I don't think you've made the proper standard of being in reasonable fear of criminal prosecution . . . Do you have any questions about it?

A: Well, I feel that, you know, I'm entitled to my defense . . . And I feel that its appropriate.

*Id.* at 6, 53-54.

Despite JE's categorical invocation of the Fifth Amendment, the Court, in its discretion, declines to draw a negative inference. No less burdensome way of obtaining the information at issue existed, especially in light of JE's lack of cooperation with Brown's investigation, and there is a need for JE's testimony, as plaintiff's deposition questions went to the central issues of this case. The fact remains, however, that plaintiff obtained a plethora of independent evidence concerning the relevant facts. In other words, the Court cannot conclude that, at the time she was deposed, the need for JE's testimony was substantial. Moreover, while not dispositive, because she is proceeding pro se, and in light of her views regarding the income tax system as expressed through her correspondences with Brown, it is questionable whether, had she not invoked the Fifth Amendment, JE's deposition responses would have been meaningful or useful. *See, e.g.*, Brown Decl. Ex. J, at 1-13; *see also* JE's Supplemental Mot. 3. Under these circumstances, drawing a negative inference from JE's refusal to answer deposition questions may be unfairly prejudicial and would not affect the outcome of this case.

JE is nonetheless precluded from offering any additional evidence to rebut plaintiff's claims. Plaintiff notified JE at the outset of her deposition that there was no threat of criminal prosecution and later cautioned her concerning the impropriety of this defense. *See* JE Dep. 6, 53-54; *see also*

*Lund*, 2011 WL 6963106 at *3-4 (taxpayer was "unable to articulate a proper basis for asserting the Fifth Amendment as a defense" where the IRS was conducting "solely just a civil investigation" and the taxpayer did not dispute that he neglected to file federal income tax returns). Plaintiff also provided a detailed explanation of JE's tax liabilities, which was based on evidence garnered through a thorough investigation. *See, e.g.*, JE Dep. 73-76; Brown Decl. Exs. J, L, R; Pl.'s Supplemental Resp. 8-26; *see also United States v. Cowan*, 535 F.Supp.2d 1135, 1143 (D.Hawaii 2009) (government met its initial burden "as a matter of law" regarding the validity of an income tax assessment by submitting IRS Form 4340 and the working papers of the investigating IRS agent). In response, JE refused to provide deposition testimony about her income, tax liability, and control and ownership of the Subject Properties or various trust-related entities. Accordingly, her blanket assertion of the Fifth Amendment prohibits her from providing any other testimony in this case.

Regardless, even considering the arguments and evidence first introduced via JE's response brief and at oral argument, there is no genuine issue as to any material fact in the case at bar. JE makes the following allegations in opposing plaintiff's motion: (1) JE "filed bankruptcy in 2010," during which "[a]ll debt was discharged"; (2) JE "did not work for NTS"; (3)VW "wanted to start a kids camp through her foundation, which she did in the year 2000"; (4) Brown "did not originally contact [JE] in regard to her not filing tax returns"; rather, he was investigating Fritts; (5) VW "created and funded . . . MSW Family Trust, ETC Trust, Tarka Foundation, Sunrise Sanitation, Moro Investment," in which JE "had no financial interest"; (6) the ETC Trust filed tax returns and paid taxes from 1997 through 2001; (7) "Brown did not complete his investigation correctly" and was nonresponsive to JE's repeated requests for "a face to face hearing" and "to many of [her] correspondences"; (8) the Subject Properties cannot be "positively identified as belonging" to JE;

Page 23 - FINDINGS AND RECOMMENDATION

and (9) "[a]ll of the questions [asked at the January 2014 deposition] were irrelevant[,] inflammatory in nature and required a 77 year old woman to try to remember minor details from what happened 14 years again."  JE's Resp. to Mot. Summ. J. 1-7; Oral Argument Hearing (June 3, 2014); JE's Supplemental Mot. 2-3; *see also* JE's Resp. to Mot. Summ. J. Exs. 1-33 (JE's bankruptcy filings, loan paperwork and account documents for Moro and Sunrise, a letter from the Social Security Administration, a Quitclaim Deed and sale documents for the Yuma Property, correspondences sent by JE in 2009 and 2010 to "Mr. Robinson" and "Mr. Hefty" regarding her tax liability, a 1998 invoice for the "disposi[tion] of trust assets" from Fung, and documents relating to the ETC Trust, the EFT, the Hope Life Foundation, the Tarka Foundation, and the MSW Family Trust).

Initially, as with TE, the evidence furnished by JE fails to support her allegations, demonstrate that the underlying tax assessment was arbitrary or erroneous, or rebut the evidence supporting plaintiff's motion.  Similarly, JE's arguments in opposition are irrelevant, conclusory, based on legal misconceptions, or inconsistent with the other, uncontradicted evidence of record. For instance, the fact Brown initially contacted JE concerning NTS's activities or that VW started a kids camp through one of her foundations is immaterial to whether JE had taxable income between 1997 and 2001.  Moreover, despite JE's bare assertions to the contrary, plaintiff's uncontravened evidence establishes that she conducted seminars and worked with NTS and/or its founders, failed to cooperate with the IRS's investigation, and created, controlled, and/or had a financial interest in the EFT, Moro, Sunrise, the Hope Life Foundation, the ETC Trust, and the MSW Family Trust.  *See generally* Walker Dep.; Deen Dep.; TE Dep.; *see also* Pl.'s Mem. in Supp. of Mot. Summ. J. Exs. 6, 25; Brown Decl. Exs. A-U.  Indeed, JE's own evidence corroborates many of these facts.  *See, e.g.*, JE's Resp. to Mot. Summ. J. 2-3 (JE "attended training seminars [with NTS] and did talk with

Page 24 - FINDINGS AND RECOMMENDATION

friends and family about the trust," and "help[ed] Mr. Fritts and Mr. Fung get their entity started");
*id.* at 3, 5 (acknowledging that she did not file tax returns for the years in question); *id.* at 6 (JE
"commuted between Gordon Ridge Rd. and Portland," and "did do some landscaping" on the
Gordon Ridge Property); JE's Resp. to Mot. Summ. J. Ex. 24 (JE was a signatory on the relevant
bank accounts); JE's Resp. to Mot. Summ. J. Exs. 22-23, 33 (JE signed as a trustee on documents
for the MSW Family Trust and the ETC Trust); JE's Resp. to Mot. Summ. J. Ex. 27 (JE signed as
the manager on documents for Sunrise).

In addition, the record demonstrates that the "ETC [Trust] has not filed fiduciary income tax
returns (forms 1041) since 1998." Pl.'s Supplemental Resp. 5 (citation and internal quotations
omitted); *see also* Pl.'s Supplemental Resp. Ex. AA. Although returns were prepared for 1999-2001,
they "were never filed with the IRS" and "are not signed and are therefore not valid." Pl.'s
Supplemental Resp. 5; *see also In re Hatton*, 220 F.3d 1057, 1060-61 (9th Cir. 2000) (a valid return
must be "executed under penalty of perjury" and "represent an honest and reasonable attempt to
satisfy the requirements of the tax law"). In any event, these documents provide more evidence of
JE's connection to the ETC Trust. Significantly, the forms from 1997, 1998, and 1999 list JE as the
"Trustee" of the ETC Trust and each form claims negative income and no tax liability. Pl.'s
Supplemental Resp. Ex. BB, at 14, 27, 45. In fact, the Form 1041 from 1999 reports negative
income, even though the JE, TE, and VW sold the Yuma Property for $1.7 million dollars that year.
*Id.* at 14. As plaintiff notes, JE's "claims that ETC Trust was legitimate, filed returns, and paid taxes
are fabrications intended to confuse the issues." Pl.'s Supplemental Resp. 7; *see also Sparkman v.
Comm'r of Internal Revenue*, 509 F.3d 1149, 1156 (9th Cir. 2007) ("[a] tax return, even [if] signed
under penalty of perjury, is not per se evidence of the income, deductions, credits, and other items

Page 25 - FINDINGS AND RECOMMENDATION

claimed therein"); *Anson v. Comm'r*, 328 F.2d 703, 705 (10th Cir. 1964) ("the Commissioner is not required to accept the sworn self-serving statement of the taxpayer that his return accurately reflects income").

The remaining contentions raised by JE present legal questions, to be determined by the Court. For example, whether plaintiff has a right to foreclose upon the Subject Properties based on JE's assessed tax deficiency is the central focus of these proceedings. In any event, JE's remaining contentions have no merit. JE's federal income tax liabilities, as well as the tax liens relating thereto, were not discharged through bankruptcy as a matter of law. 11 U.S.C. § 523(a)(1)(B)(i); *see also In re Isom*, 901 F.2d 744, 745-46 (9th Cir. 1990); *In re McCubbins*, 2000 WL 715997, *1-2 (Bankr.D.Alaska Mar. 23, 2000). Likewise, the questions posed during the January 2014 deposition were clearly both relevant and not inflammatory pursuant to Fed. R. Evid. 401, and the Court notes that JE's explanation for invoking the Fifth Amendment is not consistent with the deposition transcript. *Compare* JE Dep. 6, 53-54 (JE refusing to answer "all questions that you're going to ask me" because "I'm entitled to my defense . . . And I feel that it's appropriate"), *with* JE's Resp. to Mot. Summ. J. 7 (JE indicating that she declined to answer questions due to a lack of recollection).

In sum, JE's allegations regarding the incorrectness of Brown's assessment or her lack of taxable income are without support in the record. *See Celotex*, 477 U.S. at 322; *Hernandez*, 343 F.3d at 1116. Plaintiff furnished evidence establishing a prima facie case regarding JE's tax deficiencies for the period in question and this evidence is entitled to the presumption of correctness. JE neither rebutted that presumption nor presented evidence sufficient to demonstrate a genuine issue of material fact. *Stonehill*, 702 F.2d at 1294. Plaintiff's motion should therefore be granted as to JE's 1997-2001 income tax liabilities.

IV.    <u>Foreclosure of Tax Liens Against the Subject Properties</u>

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321; *see also* 26 U.S.C. § 6322 ("the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time"). Under 26 U.S.C. § 7403, the government may foreclose valid liens assessed pursuant to 26 U.S.C. § 6321, sell the property, and apply the proceeds towards any outstanding tax deficiency. *United States v. Rodgers*, 461 U.S. 677, 693-94 (1983). As discussed above, plaintiff satisfied its burden to establish that income taxes, penalties, and interest were properly assessed against TE for the 1998-2002 tax years and JE for the 1997-2001 tax years. Accordingly, on the dates of assessment, liens in favor of plaintiff arose and attached to all property belonging to TE and JE.

The sole remaining issue is whether TE and JE have a property interest in the Subject Properties. Federal courts turn to state law to determine whether an entity holds property ostensibly on behalf of the taxpayer, as either a nominee or alter ego. *911 Mgmt., LLC v. United States*, 657 F.Supp.2d 1186, 1193-94 (D.Or. 2009). Oregon courts apply the nominee and alter ego factors identified in *Towe Antique Ford v. Internal Revenue Serv.*, 791 F.Supp. 1450 (D.Mont. 1992), *aff'd*, 999 F.2d 1387 (9th Cir. 1993), and *Colby*, 1997 WL 1046002. *Id.*

A.    Whether the EFT and Moro Are Nominees

"[A] business holds an asset as a nominee for a taxpayer when the taxpayer maintains a beneficial interest and exerts control over the asset." *Id.* at 1194 (citation omitted).  To analyze this issue, *Towe* instructs the court to appraise: "(1) Whether the nominee paid no or inadequate consideration; (2) Whether the property was placed in the name of the nominee in anticipation of litigation or liabilities; (3) Whether there is a close relationship between the transferor and the nominee; (4) Whether the parties to the transfer failed to record the conveyance; (5) Whether the transferor retained possession; and (6) Whether the transferor continues to enjoy the benefits of the transferred property." *Id.* (citing *Towe*, 791 F.Supp. at 1454).  Additionally, *Colby* counsels the court to evaluate: "(1) the source of the funds used to purchase the property; (2) the taxpayer's continued use of the property without payment of fair rental value; (3) the taxpayer's continued payment of maintenance charges and real estate taxes; and (4) the taxpayer's acts of holding himself out as the owner of the property."  *Id.* (citing *Colby*, 1997 WL 1046002 at *20).  The court should "consider the totality of the circumstances rather than single out the presence or absence of one particular factor." *Id.* (citation omitted).

Here, the totality of the circumstances reveal that TE and JE retained a beneficial interest in and control over the Subject Properties, despite the fact that both were titled to other entities.  With respect to the Gordon Ridge Property, all but one of the *Towe* and *Colby* factors are met.  As to the first *Towe* element, the EFT paid no or inadequate consideration because the funds to purchase the Gordon Ridge Property were provided personally by TE.  TE Dep. 69-70.  Based on JE's involvement with NTS and other fraudulent tax schemes, it appears that this property was titled to the EFT in an attempt to insulate it from TE's and JE's federal tax liabilities, such that the second

*Towe* factor is met.  *See* Pl's Mem. in Supp. of Mot. Summ. J. Ex. 6; Brown Decl. Ex. J, at 1-13; TE

Dep. 13-14.  Third, there is, and has always been, a close relationship between the TE and JE, and

the EFT; JE and TE consistently controlled the trust and executed contracts on its behalf, despite

listing other family members as trustees or beneficiaries.  *See* TE Dep. 37, 58, 61-62.  TE has sole

authority over all decision making and is the only party who has ever been authorized to write checks

on behalf of the EFT.  *Id.* at 53-54, 61-63, 65-66, 69-70, 73, 107.  Concerning the fifth and sixth

*Towe* factors, for approximately ten years after the Gordon Ridge Property was purportedly

purchased by the EFT, TE and JE retained possession and control, with JE using it as her personal

residence.  *Id.* at 66-67; Walker Dep. 68-70.  Even after JE ceased living at the property, TE and JE

earned rental income therefrom and used it for their personal purposes, such as the maintenance of

livestock and housing for family members.  TE Dep. 66-67, 83-84; Deen Dep. 38, 81-82, 84-85;

Walker Dep. 70.

    Turning to the first *Colby* factor, TE decided to purchase the Gordon Ridge Property,

negotiated the price, and provided the funds.  TE Dep. 62-63, 69-70.  Second, TE and JE continued

to use the Gordon Ridge Property – first as a residence, then as a rental – without ever paying fair

rental value to the EFT.  As denoted above, JE used this property as her personal residence and for

her personal business endeavors for nearly a decade, without ever paying rent.  Even after moving

out of the property, TE and JE allowed family members to live at the property rent-free, kept animals

on the property, and, at times, earned rental income.  In regard to the third *Colby* element, JE and TE

routinely made maintenance and utility payments on the Gordon Ridge Property, as well as

improvements thereon.  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 16.  Lastly, TE listed himself as

the owner of the Gordon Ridge Property in 2006 in order to apply for a personal loan.  TE Dep. 76;

Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 17.  Based on the totality of the circumstances, the EFT held the Gordon Ridge Property as a nominee for TE and JE.

Applying the same analysis to the Sherman County Property reveals that Moro was the nominee of JE.  Regarding the first *Towe* element, Moro paid no monetary consideration for the Sherman County Property.  The stated consideration – capitalizing Moro – was inadequate, especially given that neither Walker nor Deen provided any consideration for prior transfers of the property.  Pl.'s Mem. in Supp. of Mot. Summ. J. Exs. 21-22, 24.  Second, Walker admitted that the purpose of founding Moro and transferring the Sherman County Property thereto was to insulate that property from JE's federal tax liabilities.  Walker Dep. 39-40.  Just as with the EFT, there is, and has always been, a close relationship between JE and Moro; she established the entity and made overarching decisions on its behalf without formally consulting Moro's members, such that the third *Towe* factor is met.  *Id.* at 39, 42, 44-47, 64-66, 72, 75-76, 78-79; Deen Dep. 92, 94.  Critically, JE originally identified this property for purchase and negotiated the transaction.  More recently, she entered into an arrangement with a local farmer without respecting corporate formalities or consulting anyone associated with Moro.  She also controlled the reassignments of the Sherman County Property and was primarily responsible for interacting with the attorneys who drafted the transfer paperwork.  *See, e.g.*, Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 20.  As to the sixth *Towe* element, JE retained the ability to make unilateral decisions concerning this property, despite the fact that it was supposedly owned by Moro and she was not listed as a member.  *See, e.g.*, Walker Dep. 76, 78-79.  As such, JE's interest in the Sherman County Property meets four out of six of the *Towe* factors, supporting the conclusion that Moro held the property as a mere nominee of JE.

The *Colby* factors are equally telling.  First, VW, a close relative of JE, provided the funds

to purchase the Sherman County Property. *Id.* at 81-82. Second, as discussed above, JE controlled this property and allowed it to be used by a local farmer rent-free. For the majority of the time that the Sherman County Property was ostensibly owned by other entities, JE was paying the property taxes, implicating the third *Colby* element. *Id.* at 48. Concerning the fourth *Colby* factor, JE held herself out as the owner of the Sherman County Property, at least insofar as she was executing contracts with third parties. *Id.* at 76, 78-79. In other words, JE consistently exercised control and dominion over the Sherman County Property, regardless of the fact that it had been nominally held by Moro since 2006. Therefore, the undisputed evidence of record demonstrates that the EFT and Moro held the Subject Properties as nominees for TE and JE.

      B.    <u>Whether the EFT and Moro Are Alter Egos</u>

"[A]n entity is an alter ego when it is so dominated by another so as to negate any separate entity distinction." *911 Mgmt.*, 657 F.Supp.2d at 1194 (citation and internal quotations omitted). "[T]he following factors [are] relevant to a finding of alter ego: (1) Whether the individual is in a position of control or authority over the entity; (2) Whether the individual controls the entity's actions without need to consult others; (3) Whether the individual uses the entity to shield himself from personal liability; (4) Whether the individual uses the business entity for his or her own financial benefit; (5) Whether the individual mingles his own affairs in the affairs of the business entity; and (6) Whether the individual uses the business entity to assume his own debts, or the debts of another, or whether the individual uses his own funds to pay the business entity's debts." *Id.* (citation omitted). These factors are not exclusive: "the alter ego determination depends on the facts and circumstances present in each case." *Id.* (citation omitted).

      The facts and circumstances here support the conclusion that JE and TE used alter ego

entities to acquire the Subject Properties.  Concerning the first and second factors as they relate to the Gordon Ridge Property, the record shows that TE and JE controlled the EFT, without the need to consult others.  TE Dep. 53-54, 61-63, 65-66, 69-70, 73, 107.  The supposed trustees and beneficiaries were unaware of their role as such or have otherwise disclaimed any interest in the trust or its assets.  *Id.* at 37, 54, 56; Order on Stipulated Mot. 2 (June 20, 2013); Order on Stipulated Mot. 2 (July 12, 2013).  Relatedly, TE was the only person who had authority to write checks out of EFT accounts or direct the activities of the trust.  Third, the EFT appears to exist to shield TE's and JE's assets from the IRS.  *See* Brown Decl. Ex. J, at 1-13.  As discussed above, the trust was established pursuant to a NTS tax avoidance scheme.  As to the fourth and fifth elements, TE and JE routinely used the EFT for personal purposes, including to pay their living expenses and fund trips, home improvements, and a reception for family members.  *See, e.g.*, Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 15, at 7-8, 11-12.  TE also admitted that he commingled his personal funds with those of the EFT.  TE Dep. 149-50.  The EFT meets the sixth element, as the trust was funded with personal proceeds TE and JE received from the Yuma Property sale.  *Id.* at 101-02.

Regarding Moro, the first and second factor are satisfied because JE established that entity and made decisions on its behalf, despite the fact that she was not a listed member.  Pl.'s Mem. in Supp. of Mot. Summ. J. Ex. 25; Walker Dep. 39, 42, 44-47, 64-66, 72, 75-76, 78-79.  Although she consulted informally with Walker concerning some decisions relating to Moro, that entity could not take any action until receiving JE's approval.  As to the third factor, JE formed Moro in an attempt to create distance between her tax liabilities and the Sherman County Property.  Walker Dep. 39-40. It is unclear to what degree the fourth factor is fulfilled, as JE refused to testify concerning Moro. *See, e.g.*, JE Dep. 13.  Fifth, Moro was established largely for JE's personal purposes.  Lastly, the

Page 32 - FINDINGS AND RECOMMENDATION

sixth factor is met because JE personally paid property taxes on the Sherman County Property every year, except for 2010 and 2011.  Walker Dep. 48.

Thus, even if the Subject Properties were not held by nominees, the fact remains that the EFT is the alter ego of TE and JE, and Moro is the alter ego of JE.  As such, plaintiff is entitled to foreclose on the Subject Properties because it met its prima facie case and both TE and JE failed to rebut the presumption that plaintiff's tax assessments, and corresponding liens, were valid.  Having reviewed the parties' supplemental briefing and the complete record herein, plaintiff's motion should be granted without further argument.

## RECOMMENDATION

For the foregoing reasons, plaintiff's motion for summary judgment (docket # 59) should be GRANTED and JE's and TE's supplemental motions (dockets # 76, 77) should be DENIED.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due by August 11, 2014.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 23rd day of July, 2014.


/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge


Page 33 - FINDINGS AND RECOMMENDATION